Weldon, J.,
delivered the opinion of the court.
The defendants move to dismiss this case upon three grounds, as follows:
First. Because the petition does not set forth a sufficient cause of action against the United States.
*186 Second. Because the alleged claim does not come within the general jurisdiction of the court.
Third. Because the claim is barred by both the general and special statutes of limitation.
The legal effect of the first clause of the motion is, to admit the allegations of the petition; and the question presented is, as to the sufficiency of the pleading to maintain a cause of action. It is in effect a demurrer, and raises a question of law for our determination.
It is alleged that the claimant is a citizen of the United States, residing in the city of Pittsburgh; that he has always been loyal to the United States; that preceding and during the early part of the war he had extensive business interest in and relations with the city of New Orleans; that said business was carried on, during said time, through the medium of an agent; that on the 31st of August, 1861, the so-called Confederate government passed a sequestration act, providing for the confiscation of the property of citizens of the United States, who bore allegiance to the United States, by judicial process and proceeding, according to the terms of said act; that after the passage of said act an officer of said government, called “Confederate States receiver,” instituted proceedings in the courts of the so-called Confederacy, for the purpose of confiscating the money and property of petitioner, then in the city of New Orleans, and subject to the dominion and power of said Confederate government; that by virtue of said judicial proceedings the said agent, on the 4th day of October, 1861, seized the property of the petitioner, then in the hands of his agent, consisting of money, promissory notes, and personal property, amounting in the aggregate to the sum of $55,006; that the property so seized was sold, and the proceeds paid into the Citizens’ Bank of New Orleans, to the credit of said Confederate agent; that the proceeds thus deposited remained in said bank, as aforesaid, when, after the fall of said city into the hands of the Federal forces, to wit, on the 11th day of June, 1863, General Butler, then commanding the United States forces, for the purpose of preserving the property of petitioner, seized the said money in the name and by the authority of the United States,, and on the 17th day of July, 1862, sent the same to the Treasury of the United States to be retained for the use, benefit, and behoof of the petitioner; that the proceeds of said property was *187 a part of a fund of $108,812 which was transmitted as aforesaid, said amount being in the form of bullion, and that it remains-in the care, custody, and control of the defendants; that no-part or portion of said amount has been paid the petitioner; that on the 11-th day of November, 1889, he demanded the said money from the Secretary of the Treasury, who refused to pay the same or any part thereof; that in reply to the demand made by petitioner as aforesaid, the Acting Secretary of-the, Treasury says:
“ In reply, you are informed that the funds seized from the Citizens’ Bank at New Orleans, and transmitted by General Butler to the Secretary of the Treasury, were covered into the Treasury, June 30,1868, under the provisions of the joint resolution of Congress, approved June 30, 1868, and that there is-no law authorizing the Secretary of the Treasury to adjudicate and pay Such claims.”
Although it is alleged that the bullion seized, and which represented the property of the claimant, still remains in the Treasury, the communication of the Secretary shows, that the money transmitted by General Butler was covered into the Treasury, and is now apart of Government funds in the Treasury of the United States. The theory on .which the claimant seeks to maintain this suit is, that when the motley was seized and transmitted, there originated an implied contract and obligation, on the part of the defendants, to restore the same to the lawful owner, when demanded, that the Government became a trustee of the funds, and that the statute of limitation did not attach to the rights of the parties, until a refusal on the part of the officers to refund the money to the claimant. If that contention be true as a legal theory, then this suit involves a cause of action, and the defendants should traverse the allegations of the petition, if a defense is intended.
At the time of seizure or capture, the money in controversy, was in the possession of an agent of the so-called Confederate government; it stood on the books of the bank credited to the u Confederate States receiver,” ¿subject to his draft, and subordinate to the interest and control of the public enemy of the United.States. It may have passed improperly, from the possession of the claimant to the possession of the Confederacy, but that was its condition in fact, at the time General Butler seized or captured it; and while he may have had the purpose *188 of preserving it to the petitioner, as he alleges, we can deal only in this proceeding, with what the captaring power did, and not with what the capturing officer intended.
Express contracts are the result and effect of what parties agree to, while implied contracts are the legal results and effect of what parties do. There are no allegations in the petition, from which an express contract can be deduced, and if a contract does not result from the facts alleged, there can be no right of recovery on the part of the claimant, and no right on the part of the court to deal with the case.
The discussion incident to the disposition of the demurrer, •comprehends the broad question, whether the United States are now liable in this court, for the proceeds of property, taken by capture from the public enemy, when and where such property, had been improperly confiscated by the Confederate authorities, or improperly seized, because such property belonged to a loyal citizen of the Ü nited States. A1 though confining, as we do, the liability nf the United States Government to what was done by the mere act of capture or seizure, unaffected by the purpose of the capturing officer, the question is far-reaching and important.
♦ The state of the law at a certain period, is often determined by ascertaining what changes have been made at a subsequent time, by the act of the legislative power. The capture or seizure in this case was made in June, 1862, and at that time there was no statute of the United States, which by its provisions applied to a seizure of property in the enemy’s country, belonging to a loyal citizen of the United States. To afford a remedy to loyal owners Congress, on the 12th of March, A. D. 1863, •passed the abandoned property act (12 Stat. L., 820), and on :the 2d day of Jnly, 1864, passed an additional act amending the former act (13 Stat. L., 375).
These statutes embrace in detail, a mode of dealing with property of loyal citizens captured or abandoned, and the fundamental policy, of restoring to loyal claimants, property captured or abandoned, was provided for and recognized, for the ■first time by the provisions of these statutes. This legislation, ■ tends to show, the legal status and condition of property, taken by the Army of the United States, antecedent to the passage of those laws. It is insisted, that the captured and abau--doned property act, had no application to the rights of the *189 claimant; that may be true, and it is to be considered only, for the purpose of ascertaining the state of the law, at the’ time it is alleged the capture was made.
If the transaction, became subject to the provisions of the said statute, this proceeding would be clearly within the limitation as applicable to that law, and the claim would have to be dismissed, under the third clause of the defendant’s motion. If this court, has jurisdiction of the alleged cause of action, presented by the allegations of this petition, it is under that provision of 1059, of the Revised Statutes, which provides a jurisdiction “upon contracts, expressed or implied.” There is no contention that there was any express contract, and the-claim is predicated upon the legal evolution of an implied contract.
If private property is taken for public use, the Government clearly recognizing at the time of the taking, that it is a taking of the property of a citizen; and no claim of ownership or title is made to the property by the Government, it might beheld, that the mere appropriation by-the Government, without the knowledge or consent of the owner, would create an implied obligation to pay, on which, in a judicial proceeding, the-United States might be held liable; in other words, when the Government, in the exercise of the right of eminent domain,, appropriates or uses private property, there is an implied agreement to pay for it, on which a suit can be maintained, unless the cause of action is barred by the statute of limitations.
But that condition does not exist in this case, and it is not necessary to pass upon the ultimate question of the defendant’s-liability. General Butler at the time the seizure was made, was a military officer of Vhe United States, acting in his capacity as such, in the prosecution of belligerent operations against the public enemy of the United States. He was not in the exercise of civil power, and was not the representative of the United States, to make contracts or impose civil obligations;, and did not assume to perform any function, except a military duty. When he captured Few Orleans, he found a large fund in the Bank of New Orleans credited to the “Receiver of the-Confederate States;” and to cripple the resources of those States, he seized this property and transferred it to the jurisdiction and control of the United States. In the letter to the *190 Secretary of the Treasury transmitting' drafts for the. funds seized, he says:
“ The principal amounts are from banks, to the credit of the receivers of the Confederate States, and will make a fund upon which those whose property has been confiscated may have a claim.”
The specific fund arising from the sale of claimant’s property, in the proceedings of confiscation under the Confederate statutes, was not sent to the Treasury, but constituted, as alleged, a part of an aggregate fund of $245,760.10.
This court, in the Haycraft Case (8 C. Cls. R., 483), said:
“ So far as they (referring to the principles in the Klein case) relate to suits for the recovery of the proceeds of abandoned or captured property, it is observable that the Government is held to be a trustee, not for all indiscriminately whose property was captured and sold and passed into the Treasury in money, but primarily for those only who were, by the terms of the act, declared entitled to the proceeds of their abandoned or captured property; and, secondarily, for those whom the Government should thereafter recognize as entitled. The descriptions of persons might be many or few, as might be the actual number; but, whether many or few, it is settled by the court of last resort that none can reclaim the proceeds of their property from the Treasury but those specified in that act, or who should be thereafter specified in some other act of Congress.”
In the same direction of authority, it is said in the Moore Case (10 C. Cls. R., 375):
“We recognize the ‘humane maxims of the modem law of nations which exempt private property of non-combatant enemies from capture as booty of war’ (Klein's Case, 7 C. Cls. R., 243, 13 Wall., 128), and the Constitutional provision that Congress has power to ‘make regulations concerning captures made on land and water’ (Constitution, Article I, section 8, par. 2). But, until Congress makes the necessary regulations and confers the authority, this court has no jurisdiction to compel the United States to refund money obtained contrary to those maxims.
“Before Congress made regulations and enacted laws in relation to the seizure and disposition of the enemy’s property all property so seized became vested in the United States by the rigorous rules of earlier warfare, which were justified on the ground that the power and resources of the enemy were weakened and those of the captors strengthened thereby. And now that Congress has made some provisions for returning the proceeds of captured and abandoned property in specified *191 cases tliis court with its limited power can take no jurisdiction beyond that which is clearly and expressly given by statute.”
It is not necessary in this connection to speculate on the rights of the claimant in the property seized by General Butler; it is a question of judicial jurisdiction, that we are to determine. It is contended, that upon the receipt of the inouey by the Treasury Department, the United States became a trustee for the claimant, and the cause of action did not accrue until the disavowal of the trust in the year 1889. If there is no jurisdiction in this court, to enforce by its judgment, any legal obligation against the Government, because of the capture, then no resulting trust can originate in favor of the claimant, founded on such capture. Resulting trusts, as applicable to the ownership of property, are founded upon a right, in the cestui que trust, existing at the time, the alleged trustee becomes legally invested with the property. The Supreme Court held in the captured and abandoned property cases, that the United States were a trustee for the loyal owners of property captured; but the decisions in those cases, were based on the provisions of the statute, which has no application to the rights of the claimant in this case. So far as we have examined we concur in the statement made by counsel for the defendants.
“ Whenever the United States have been recognized by the court as a trustee it has been by virtue of some statute of Congress putting them in that relation.”
If the claimant has any rights, legal or equitable, in the fund now in the Treasury, he must apply to that branch of the Government, that exercises discretion and determines policies, and not to the judicial branch, which is limited by law. The demurrer will be sustained on the ground first set out, to wit: “Because the petition does not set forth a sufficient cause of action against the United States.”
The petition is dismissed with leave to the claimant to have the judgment set aside for the purpose of amending his petition if he makes a motion to that effect on or before May 1,1890.